UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ANGELITO C. MERCADO,                     )
                                         )
                    *Plaintiff*,         )
                                         )
            v.                           )          No. 1:21-cv-00429-JMS-MJD
                                         )
COLUMBUS REGIONAL HOSPITAL,              )
DR. SAMUEL LOCOH-DONOU,                  )
EMERGENCY PHYSICIANS OF INDIANA, INC.,   )
R.N. SHELBY FLUHR, and                   )
R.N. KRISTA BERRY,                       )
                                         )
                    *Defendants*.        )

## ORDER

On July 15, 2020, *pro se* Plaintiff Angelito Mercado was arrested and, while in custody,

taken to Columbus Regional Hospital ("the Hospital") for medical care. He filed this lawsuit

against the Hospital, Dr. Samuel Locoh-Donou, Emergency Physicians of Indiana, Inc. ("EPI"),

Nurse Shelby Fluhr, and Nurse Krista Berry, alleging that Defendants violated his constitutional

rights and Indiana law by forcibly sedating him, administering a Covid-19 test against his will,

and failing to examine or treat him after being informed that he may have swallowed narcotics.

[Filing No. 15.] Defendants have filed a Motion for Summary Judgment, [Filing No. 33], which

is ripe for the Court's review.

## I.
### SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to

judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must

show the Court what evidence it has that would convince a trier of fact to accept its version of

the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "'Summary judgment is not a time to be coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)). Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS

As an initial matter, the Court notes that Mr. Mercado provided video evidence in response to Defendants' Motion for Summary Judgment. [*See* Filing No. 42.] This evidence consists of 13 separate videos captured by body cameras worn by law enforcement officers or cameras located in or on law enforcement vehicles. Because the claims at issue in this lawsuit only concern Mr. Mercado's medical treatment at the Hospital, much of the video evidence—including, for example, several hours of video showing officers' activities at the scene of the traffic stop after Mr. Mercado had already been transported to the Hospital—is irrelevant. To the extent the video evidence is relevant to this case, it is consistent with the affidavits submitted by Defendants and with the police reports submitted by Mr. Mercado, on which the Court primarily relies in setting forth the undisputed facts. Furthermore, to the extent that Mr. Mercado's version of events is blatantly contradicted by the video evidence, the Court may rely on the video evidence and disregard his version of events. *See Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) ("When the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape.").

In addition, Mr. Mercado failed to follow Local Rule 56, which requires a non-movant to include in his response to a motion for summary judgment a section labeled "Statement of Material Facts in Dispute" identifying potentially determinative facts and factual disputes, and dictates that a party support each asserted fact with a citation to admissible evidence.  *See* S.D. Ind. L.R 56-1(b), (e).  As a result, the Court may accept each of the properly asserted facts in Defendants' Motion for Summary Judgment as undisputed.  Nevertheless, in light of Mr. Mercado's *pro se* status, the Court has reviewed all of the evidence he submitted to identify any disputes of material fact.

With these caveats in mind, the following factual background is set forth pursuant to the standard detailed above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made," *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005), except to the extent that Mr. Mercado's version of events is contradicted by video evidence, *see Williams,* 809 F.3d at 942.

### A. The Traffic Stop and Arrest

On July 15, 2020, Officer Drake Maddix of the Columbus Police Department ("CPD") and Deputy Dylan Prather of the Bartholomew County Sheriff's Office conducted a traffic stop of a vehicle driven by Mr. Mercado.  [Filing No. 40-2 at 9; Filing No. 40-2 at 12.]  Mr. Mercado refused to comply with the officers' orders to exit the vehicle and to drop the items he was holding in his hands, so the officers placed him in hand restraints.  [Filing No. 40-2 at 12.] When he was told that he would be going to jail, Mr. Mercado fell to the ground and stated that

he was having a panic attack.  [Filing No. 40-2 at 12; *see also* 1902 Bodycam[1] at 04:20-05:00.]

He also complained of back pain and stated that he had Covid-19.  [Filing No. 40-2 at 12; *see also* 1902 Bodycam at 04:20-04:24 (Mr. Mercado stating, "Dude, I got corona, man!").]  As a result, the officers immediately called for an ambulance.  [Filing No. 40-2 at 12; 1902 Bodycam at 04:20-05:00.]  Mr. Mercado was yelling, "making unreasonable noises," and "drawing a crowd due to his conduct," [Filing No. 40-2 at 12], and he refused to cooperate with the officers or emergency medical personnel, [Filing No. 40-2 at 9].  He also complained of a back injury he sustained during a recent car accident.  [*See* 1910 Bodycam[2] at 07:40-09:10.]

CPD Officer Brandon Decker accompanied Mr. Mercado in the ambulance during transport.  [Filing No. 40-2 at 9.]  Mr. Mercado was restrained in the ambulance due to his erratic behavior.  [Filing No. 40-2 at 9-10.]  He was yelling, struggling against his restraints, spitting, and complaining of muscle spasms in his back.  [1910 Bodycam at 10:15-24:00.]  While in the ambulance, Mr. Mercado repeatedly hit and rubbed his face against the hard plastic rail on the side of the stretcher, which eventually caused his nose to bleed.  [Filing No. 40-2 at 9-10.]  He also was repeatedly "digging at his buttocks and crotch area."  [Filing No. 40-2 at 10.]  Mr. Mercado threatened to kill himself and stated again that he had Covid-19.  [Filing No. 40-2 at 10; *see also* 1910 Bodycam at 14:05-14:15; 23:50-24:10.]

---

[1] The Court uses "1902 Bodycam" to refer to the video titled "AXON_Body_2_Video_2020-07-15_1902" on the flash drive submitted by Mr. Mercado.  This video has the identifier "X81171483" in the upper right corner.  Neither party clearly delineates for the Court the source of each video, but based on context clues, the Court surmises that this video was captured by Officer Maddix's body camera.

[2] The Court uses "1910 Bodycam" to refer to the video titled "AXON_Body_2_Video_2020-07-15_1910" on the flash drive submitted by Mr. Mercado.  Mr. Mercado refers to this video in his filings using "X81243432," which corresponds to the identifier in the top right corner of the video.  Again, neither party identified the source of this video, but based on the context, the Court surmises that it was captured by CPD Officer Brandon Decker's body camera.

**B. Treatment of Mr. Mercado at the Hospital**

Mr. Mercado arrived at the Hospital at approximately 7:37 p.m. [Filing No. 34-1 at 3.] Dr. Locoh-Donou, Nurse Fluhr, and Nurse Berry were working in the emergency department at the time of Mr. Mercado's arrival. [Filing No. 34-1 at 3; Filing No. 34-2 at 2; Filing No. 34-3 at 2.] Dr. Locoh-Donou is employed by EPI, which contracts with the Hospital to provide emergency medicine services. [Filing No. 34-1 at 2-3.] Nurse Fluhr and Nurse Berry are employed by the Hospital. [Filing No. 34-2 at 2; Filing No. 34-3 at 2.] The legal name of the Hospital is Bartholomew County Public Hospital d/b/a Columbus Regional Hospital, and it is a county-owned public hospital. [Filing No. 34-4 at 1.]

Because Mr. Mercado was "severely agitated and combative" when he arrived at the Hospital, Dr. Locoh-Donou ordered that Mr. Mercado be chemically sedated and restrained in soft restraints to prevent him from injuring himself or others. [Filing No. 34-1 at 3.] Accordingly, he was administered a shot containing Haldol, Ativan, and Benadryl at 7:58 p.m. [Filing No. 34-1 at 3-4.] Before the shot was administered, Mr. Mercado was repeatedly asked if he had any allergies to medications, but he did not respond. [1910 Bodycam at 36:20-36:30.] Mr. Mercado did not consent to the shot and had to be held down by police officers and medical personnel for it to be administered. [1910 Bodycam at 36:30-37:55.] While this was occurring, Mr. Mercado repeatedly complained that he was being choked, that someone was touching his neck, and that his neck was being "twisted." [1910 Bodycam at 36:30-37:55.] Mr. Mercado's head and neck are not constantly visible in the frame of the bodycam video. [*See* 1910 Bodycam at 36:30-37:55.] At some points, one officer can be seen stabilizing Mr. Mercado's head with his hands on Mr. Mercado's head, although the officer is not choking Mr. Mercado or twisting his neck. [*See* 1910 Bodycam at 37:30-37:55.] The officer immediately took his hands off of Mr.

6

Mercado's head and neck once the shot was administered.  [1910 Bodycam at 37:50-37:55.]  The chemical sedation caused no physical harm to Mr. Mercado.  [Filing No. 34-1 at 5.]

In addition, because Mr. Mercado reported that he had Covid-19, Dr. Locoh-Donou ordered a Covid-19 Antigen Test with a nasopharyngeal swab specimen.  [Filing No. 34-1 at 3-4.]  According to Dr. Locoh-Donou, "[t]his testing was not ordered by the police and was done for medical purposes in order to protect Mr. Mercado and others who came in contact with him," and such testing "was being done frequently at that time on individuals presenting for care to the [Hospital] regardless of their race, color, national origin, religion, or sex due to the ongoing COVID-19 pandemic."  [Filing No. 34-1 at 4.]  Dr. Locoh-Donou further stated that the test did not pose a substantial risk of serious harm to Mr. Mercado, and in fact not performing the test would have posed a substantial risk of serious harm to Mr. Mercado and others, especially given that he was going to be confined in the Bartholomew County Jail.  [Filing No. 34-1 at 4.]

Mr. Mercado objected to the Covid-19 test being performed and repeatedly asserted that no one could extract his DNA or any of his bodily fluids without a warrant.  [*See* 1910 Bodycam at 42:20-47:30.]  He refused to cooperate with the test, and police officers and medical personnel had to hold him down to perform the nasopharyngeal swab.  [Filing No. 34-1 at 4; *see also* 1910 Bodycam at 44:30-47:30.]  Mr. Mercado asserts that one officer put him in a chokehold while Dr. Locoh-Donou, Nurse Fluhr, Nurse Berry, and other officers held his arms and feet, and that "[w]hile [his] neck was being twisted and the Doctor and nurse [were] grabbing [him] by [his] face[,] a Covid-19 test was performed."  [Filing No. 41 at 3.]  He contends that although his head and neck cannot be seen in the bodycam footage, it is "obvious" that his "body was being pulled upward as if in a chokehold while being forced to take a Covid test."  [Filing No. 47 at 3; *see also* Filing No. 47 at 5 (explaining that "the body camera fram[e] is cut off right at [his] chest

7

and below his neck" but "you can see [his] body is lifted up off the bed as if he is in a choke hold being held upwards and pulled while one officer holds down his arm"); Filing No. 47 at 7-8 (asserting that "you can clearly tell he is being held around the neck and being pulled upward").] The bodycam video is not consistent with Mr. Mercado's assertions. Although the swabbing of his nose occurs outside the frame, there is no indication that anyone has him in a chokehold at that time. [*See* 1910 Bodycam at 45:00-45:55.] In fact, the video shows two medical professionals standing near Mr. Mercado's head and shoulders, but no police officer in that immediate area or in such a position that it would have been possible to have put Mr. Mercado in a chokehold. [*See* 1910 Bodycam at 45:00-45:55.] Mr. Mercado can also be seen pushing himself up off the bed with his arms and struggling against the people who are attempting to hold him down onto the bed. [*See* 1910 Bodycam at 45:00-45:55.] He does not complain about being choked or about anyone touching his neck. [*See* 1910 Bodycam at 45:00-45:55.]

According to Dr. Locoh-Donou, Mr. Mercado was not choked when the specimen was obtained, he suffered no physical injury from the test, and no police officers were interrogating him at the time his specimen was obtained. [Filing No. 34-1 at 4.] Mr. Mercado's test was negative, indicating that he did not have Covid-19. [Filing No. 34-1 at 4.]

After the Covid-19 test was performed, Mr. Mercado told Officer Decker that he had "swallowed something" and explained that his previous statements in the ambulance suggesting that he would kill himself were in reference to him having swallowed drugs and that he might die as a result. [Filing No. 40-2 at 10; 1910 Bodycam at 47:45-51:30.] Officer Decker immediately informed medical personnel that Mr. Mercado was claiming that he swallowed narcotics. [1910 Bodycam at 50:45-51:15.] Based on this information, Dr. Locoh-Donou ordered an EKG test, which was performed at 8:25 p.m. and did not reveal any acute findings. [Filing No. 34-1 at 4-

8

5.] Dr. Locoh-Donou also ordered constant cardiac monitoring and monitoring of Mr. Mercado's blood glucose and sedation. [Filing No. 34-1 at 5.] In addition, because of Mr. Mercado's self-inflicted injuries to his head sustained in the ambulance and his complaints of neck pain, Dr. Locoh-Donou ordered CT imaging of Mr. Mercado's head and cervical spine. [Filing No. 34-1 at 4.] The CT studies "showed no acute intracranial process" but "demonstrated degenerative disc disease with spondylosis and no acute fracture or malalignment." [Filing No. 34-1 at 4.]

Officer Maddix applied for and was granted a warrant to search Mr. Mercado's person, which included an x-ray and body cavity search. [Filing No. 40-2 at 11.] Dr. Locoh-Donou ordered an abdominal x-ray, which he asserts is the only test conducted at the request of the CPD, while all of the other tests were ordered for Mr. Mercado's care by medical staff, based on Mr. Mercado's medical history and clinical condition. [Filing No. 34-1 at 5; *see also* Filing No. 40-2 at 11.] The x-ray revealed a bag of what appeared to be methamphetamine concealed in Mr. Mercado's underwear. [Filing No. 40-2 at 11.]

Dr. Locoh-Donou performed a final assessment of Mr. Mercado at 11:03 p.m. and medically cleared him for jail. [Filing No. 34-1 at 5.] Nurse Fluhr and Nurse Berry monitored Mr. Mercado until he was discharged just before midnight. [Filing No. 34-2 at 3; Filing No. 34-3 at 3.] He was then transported to the Bartholomew County Jail. [Filing No. 40-2 at 11.]

**C. This Lawsuit**

In his Amended Complaint, Mr. Mercado asserts the following claims against Dr. Locoh-Donou, Nurse Fluhr, and Nurse Berry (collectively, "the Medical Defendants"): (1) illegal search and seizure and excessive force in violation of the Fourth Amendment; (2) failure to intervene; (3) deliberate indifference; (4) racial discrimination; (5) conspiracy; (6) torture; (7) assault; (8) battery; (9) "Violation of Reasonable Duty of Care"; (10) negligence; (11) intentional

infliction of emotional distress; (12) "Violation of Equal Protection Law"; and (13) "Human Rights Violation." [Filing No. 15 at 5-6.]  He later voluntarily dismissed the claims for assault and battery.  [Filing No. 32; Filing No. 39.]  Against the Hospital and EPI, Mr. Mercado asserts claims for: (1) negligence; (2) "Responde[a]t Superior Liability"; and (3) emotional distress. [Filing No. 15 at 6-7.]  In his Amended Complaint, he references the following statutes: 42 U.S.C. § 1983; 42 U.S.C. § 1985; and 18 U.S.C. § 2340.  [*See* Filing No. 15.]

### III.
#### DISCUSSION

**A.  Federal Claims**

*1.*  Respondeat Superior *Liability*

Defendants argue that there is no vicarious liability for claims brought under 42 U.S.C. § 1983, and therefore Mr. Mercado cannot assert any of his federal claims against the Hospital or EPI.  [Filing No. 34 at 18.][3]

In response,[4] Mr. Mercado maintains that because the Medical Defendants were employed by the Hospital and EPI, the Hospital and EPI are responsible for the Medical Defendants' violations of his civil rights.  [Filing No. 47 at 9.]

---

[3] Defendants further contend that Mr. Mercado has not stated a claim against the Hospital under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), because he has not shown that any alleged harm was the result of a policy or a decision by a person with policymaking authority.  [Filing No. 34 at 19.]  However, the Court does not read Mr. Mercado's Amended Complaint as asserting a *Monell* claim.  Further, Mr. Mercado does not discuss a potential *Monell* claim in any of his summary judgment filings.  [*See* Filing No. 40; Filing No. 41; Filing No. 45; Filing No. 46; Filing No. 47.]  Accordingly, the Court concludes that no *Monell* claim is at issue in this lawsuit.

[4] In response to Defendants' Motion for Summary Judgment, Mr. Mercado filed two apparently identical documents titled "Plaintiff['] s Objection For Summary Judgment," [Filing No. 40; Filing No. 45], two apparently identical affidavits, [Filing No. 41; Filing No. 46 at 1-3], and a brief in support of his objection to summary judgment, [Filing No. 47].  The Court has reviewed

Defendants do not specifically address this issue in their reply.  [*See* Filing No. 50.]

"Section 1983 provides a federal remedy against state actors who deprive others of federal rights."[5]  *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022).  It is well established that there is no vicarious or *respondeat superior* liability in § 1983 actions.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) ("*Respondeat superior* or vicarious liability will not attach under § 1983."); *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021) ("There is no such thing as *respondeat superior* liability for government officials under § 1983."). Accordingly, Mr. Mercado cannot assert any of his federal claims against the Hospital or EPI on a theory of vicarious liability.  Defendants' Motion for Summary Judgment is **GRANTED** as to all federal claims against the Hospital and EPI.  The Court therefore considers Mr. Mercado's federal claims as they relate to the Medical Defendants only.

### 2. Fourth Amendment Search and Excessive Force

In support of their Motion for Summary Judgment, Defendants assert that the Medical Defendants did not violate Mr. Mercado's Fourth Amendment rights by administering a Covid-19 test because the test was reasonable under the circumstances and not done for purposes of determining his guilt or innocence of any crime, but instead was done to assure his wellbeing before transporting him to jail and to protect the wellbeing of others who would come into contact with him.  [Filing No. 34 at 12-16.]  In the alternative, Defendants argue that even if the Covid-19 test violated the Fourth Amendment, they are entitled to qualified immunity from Mr. Mercado's claims because it was not clearly established on July 15, 2020 that an involuntary

---

all of these materials and considers them collectively to constitute Mr. Mercado's response.  In the interest of simplicity, the Court will cite to only one of each of the identical pairs of filings.

[5] The Medical Defendants concede that they are state actors solely for purposes of their Motion for Summary Judgment.  [Filing No. 34 at 12.]

nasopharyngeal swab Covid-19 test under the circumstances presented here violated the Fourth Amendment.  [Filing No. 34 at 22-24.]

Mr. Mercado asserts that excessive force was used to compel him to submit to a Covid-19 test, in violation of the Fourth Amendment.  [Filing No. 47 at 1; Filing No. 47 at 6-8.] Specifically, Mr. Mercado asserts that "one officer" put him in a chokehold while the Medical Defendants and other officers held his arms and feet, and that "[w]hile [his] neck was being twisted and the Doctor and nurse [were] grabbing [him] by [his] face[,] a Covid-19 test was performed."  [Filing No. 41 at 3.]  Mr. Mercado further argues that the Covid-19 test itself violated the Fourth Amendment because it was done without a warrant.  [Filing No. 47 at 6-8.] He maintains that the test was unnecessary and "pointless" because: (1) he never complained of Covid-19 symptoms; (2) there was no treatment or vaccine available at the time, so a positive result would not have led to treatment for Covid-19; and (3) the jail he was being transported to was already on lockdown as a result of the Covid-19 pandemic, and therefore he was going to be put into segregation and not going to come into contact with others at the jail, regardless of whether he had Covid-19 or not.  [Filing No. 47 at 1-2; Filing No. 47 at 7.]  Finally, Mr. Mercado points out that he was a pretrial detainee, not a convicted prisoner, at the time of the test, and therefore he was subject to greater protections than prisoners in other cases in which courts have held that forced Covid-19 testing is permissible.  [Filing No. 47 at 8.]

In their reply, Defendants maintain that Mr. Mercado's Fourth Amendment rights were not violated.  [Filing No. 50 at 3-6.]  Defendants discuss the video evidence, contend that it does not support Mr. Mercado's version of events, and assert that the force used to complete the Covid-19 test was objectively reasonable based on the totality of the circumstances.  [Filing No.

50 at 3-5.] Defendants also reiterate that the Covid-19 test was medically necessary and was performed in an objectively reasonable manner. [Filing No. 50 at 6.]

      a.  <u>Search</u>

"The Fourth Amendment, binding on the States by the Fourteenth Amendment, provides that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *Maryland v. King*, 569 U.S. 435, 446 (2013). "The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction." *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 613-14 (1989). "[I]ntrusions into the human body," such as drawing an individual's blood to test it for alcohol content or swabbing an individual's mouth for DNA, have been deemed searches that implicate the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 767-71. *See also Birchfield v. North Dakota*, 579 U.S. 438, 455 (2016) ("[O]ur cases establish that the taking of a blood sample or the administration of a breath test is a search."); *Maryland v. King*, 569 U.S. at 446 ("It can be agreed that using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search."). Accordingly, in this case the Court assumes that the nasopharyngeal Covid-19 test administered to Mr. Mercado constituted a search for purposes of the Fourth Amendment. *See Streight v. Pritzker*, 2021 WL 4306146, at *5 (N.D. Ill. Sept. 22, 2021) ("Streight's Fourth Amendment right is implicated by the taking of saliva for a COVID test.").

However, "the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." *Skinner*, 489 U.S. at 619. Whether a search is reasonable depends on the totality of the circumstances, and "the permissibility of a particular practice 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of

legitimate governmental interests.'" *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 654 (1979)). In conducting this balancing, courts consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Brown v. Polk Cnty., Wisconsin*, 965 F.3d 534, 538 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1304 (2021) (internal quotations and citation omitted).

Turning first to the nature of the intrusion upon Mr. Mercado's Fourth Amendment rights, the Court concludes that a compulsory nasopharyngeal swab to test for Covid-19 was only minimally intrusive. Other courts that have considered this issue have characterized nasopharyngeal swab Covid-19 tests as "negligible intrusions" into the privacy of the person being tested. *See Burcham v. City of Los Angeles*, 562 F. Supp. 3d 694, 703 (C.D. Cal. 2022) (collecting cases). This is because, although the test requires a swab be taken from inside the person's body, the test is performed in a matter of seconds, is not particularly painful or humiliating, and does not involve a body part traditionally shielded by great privacy. *Id.* (citations omitted). Furthermore, a nasopharyngeal swab is similar in nature to buccal swabs used to collect DNA samples, which the Supreme Court has specifically deemed a negligible intrusion. *See Maryland v. King*, 569 U.S. at 446 ("A buccal swab is a far more gentle process than a venipuncture to draw blood. It involves but a light touch on the inside of the cheek; and although it can be deemed a search within the body of the arrestee, it requires no surgical intrusions beneath the skin. The fact than an intrusion is negligible is of central relevance to determining reasonableness, although it is still a search as the law defines that term.") (internal quotations and citation omitted).

On the other side of the scale, the government interest in procuring a Covid-19 test from Mr. Mercado was significant. The Seventh Circuit has recognized that the state has "an obvious

interest in ensuring that detainees admitted to the jail do not need immediate medical care." *Sullivan v. Bornemann*, 384 F.3d 372, 376 (7th Cir. 2004). It also has a significant interest in preventing the spread of contagious diseases among prison and jail populations. *See Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (recognizing that "correctional officials have an affirmative obligation to protect inmates from infectious disease"); *Wilcox v. Lancour*, 2021 WL 230113, at *8 (W.D. Mich. Jan. 22, 2021) (recognizing "a legitimate—indeed compelling— governmental interest in testing all prisoners for the presence of the SARS-CoV-2 virus, in order to meet its obligations to control contagion and to protect its other prisoners and staff"); *Streight*, 2021 WL 4306146, at *6 (concluding that the "nature and immediacy of the government concern [regarding the spread of Covid-19] is great"). In addition, the state has an interest in containing the spread of the Covid-19 virus outside of prisons and jails. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (recognizing that "[s]temming the spread of COVID-19 is unquestionably a compelling [state] interest").

Mr. Mercado was tested for Covid-19 because he repeatedly said that he had it, and because knowing whether he did was necessary to help better protect the people he would come into contact with at the Hospital, during transport, and eventually at the Bartholomew County Jail. Any suggestion by Mr. Mercado that he did not tell the police or medical personnel that he had Covid-19 is blatantly contradicted by the video evidence. [*See* 1902 Bodycam at 04:20-04:24 (Mr. Mercado stating, "Dude, I got corona, man!"); 1910 Bodycam at 14:05-14:15; 23:50-24:10.] Furthermore, any argument that the Covid-19 test was "pointless" because there was no treatment for Covid-19 at the time and because the Bartholomew County Jail was on lockdown is nonsensical. Although Covid-19 treatments were likely not available to Mr. Mercado in July 2020, knowing whether he was infected with Covid-19 would have been relevant information to

Hospital and jail staff in their efforts to treat any symptoms and to prevent contact between infected individuals and others.

"[T]he ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995). Here, the balance of competing interests weighs heavily in favor of finding that the compelled Covid-19 test performed on Mr. Mercado was reasonable under the circumstances. The test was performed at the Hospital for medical purposes, in furtherance of the government's recognized interests in limiting the spread of Covid-19, and to protect the individuals he came into contact with after he stated that he was infected with the virus—not for the purpose of gathering evidence related to any crime. It was a relatively quick process that only minimally intruded onto Mr. Mercado's privacy interests. Accordingly, the Court concludes that the test was reasonable and did not violate Mr. Mercado's Fourth Amendment right against unreasonable searches. *See Wilcox*, 2021 WL 230113, at *11 ("[T]he balancing of Plaintiff's limited Fourth Amendment interest against the significant governmental interest in controlling a pandemic weighs heavily in favor of permitting Defendants to subject Plaintiff to the limited intrusion of a deep nasal swab.").

In any event, the Medical Defendants are protected by qualified immunity. "A public official is entitled to qualified immunity from suit unless he violated a clearly established constitutional right." *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Whether qualified immunity applies involves two questions, which may be addressed in either order: (1) whether the facts shown by the plaintiff establish a violation of a constitutional right; and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct. *Dockery*, 911 F.3d at 466 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "To show that a right is clearly established, the plaintiff

must demonstrate that existing caselaw at the time of the events in question 'placed the statutory or constitutional question beyond debate.'" *Dockery*, 911 F.3d at 466 (quoting *Al-Kidd*, 563 U.S. at 741).

Mr. Mercado has not pointed to—and the Court's research has not revealed—any binding case clearly establishing, as of July 15, 2020, that medical providers forcibly administering a nasopharyngeal swab Covid-19 test to a person in police custody who claims to be infected with Covid-19 as a part of the procedure to medically clear him for jail violates the Fourth Amendment.  Accordingly, the Medical Defendants are entitled to qualified immunity on Mr. Mercado's Fourth Amendment search claim.

For all of these reasons, Defendants' Motion for Summary Judgment, [Filing No. 33], is **GRANTED** as to Mr. Mercado's claim that the Covid-19 test violated his rights under the Fourth Amendment.

b. Excessive Force

Mr. Mercado asserts that excessive force was used against him while he was at the Hospital, both when medical staff was administering the Covid-19 test and at other times.  As an initial matter, although the parties discuss Mr. Mercado's excessive force claim under the Fourth Amendment, the Court notes that the Due Process Clause of the Fourteenth Amendment protects pretrial detainees from excessive force while in custody.  *See, e.g.*, *Kingsley v. Hendrickson*, 576 U.S. 389, 391-92 (2015).  However, the Court need not determine whether the Fourth or the Fourteenth Amendment applies to this situation, because under either amendment, a plaintiff must demonstrate that the force used against him was objectively unreasonable.  *See Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241 (2021) ("We need not address whether the Fourth or Fourteenth Amendment provides the proper basis for a claim of excessive force against

a pretrial detainee in Gilbert's position. Whatever the source of law, in analyzing an excessive force claim, a court must determine whether the force was objectively unreasonable in light of the facts and circumstances of each particular case.") (internal quotations and citations omitted).

Objective reasonableness turns on the facts and circumstances of each case and is judged from the perspective of a reasonable officer on the scene. *Kingsley*, 576 U.S. at 397 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The following considerations may bear on the reasonableness or unreasonableness of the force used: (1) "the relationship between the need for the use of force and the amount of force used"; (2) "the extent of the plaintiff's injury"; (3) "any effort made by the officer to temper or to limit the amount of force"; (4) "the severity of the security problem at issue"; (5) "the threat reasonably perceived by the officer"; and (6) "whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397. This list is not exhaustive. *Id.*

To the extent that Mr. Mercado asserts that a police officer put him in a chokehold, that assertion does not establish an excessive force claim against the Medical Defendants. No police officers are parties to this action, so any conduct by the police officers cannot be the basis of Mr. Mercado's excessive force claims against the Medical Defendants. To the extent that any officers' actions are relevant to Mr. Mercado's claim that the Medical Defendants failed to intervene to prevent a violation of his constitutional rights, those actions are discussed below with respect to the failure-to-intervene claim. The Court therefore only addresses Mr. Mercado's assertions that the Medical Defendants used excessive force by holding him down or placing him in a chokehold either to administer the sedation shot or to perform the Covid-19 test.

For the reasons described above, the video evidence does not support Mr. Mercado's assertion that he was placed in a chokehold by any of the Medical Defendants while the Covid-19 test was performed or while the sedation shot was administered. [*See* 1910 Bodycam at

18

36:30-37:55; 1910 Bodycam at 45:00-45:55.]   But even accepting Mr. Mercado's version of events as true and assuming that one of the Medical Defendants put him in a brief chokehold while restraining him, the Court finds that no reasonable jury could conclude that the force used against him by the Medical Defendants was objectively unreasonable under the circumstances. The video evidence demonstrates that Mr. Mercado was uncooperative, agitated, and continuously thrashed around and struggled against his restraints, the officers, and the medical personnel, which posed a risk of harm to himself and to those around him.   As noted above, the government has a significant interest in providing medical care to and medically clearing detainees who are on their way to jail, and in order to administer that necessary care, the Medical Defendants and others on the scene had to restrain Mr. Mercado.   In addition, Mr. Mercado has provided no evidence that the Medical Defendants' actions resulted in any injury to him, and indeed his CT scan showed no fracture or malalignment of his neck.   With respect to the alleged chokehold specifically, the video evidence demonstrates that Mr. Mercado was not rendered unconscious or otherwise incapacitated and he continued to speak and yell.   Considering all of these circumstances, no reasonable jury could conclude that the force used against Mr. Mercado was excessive or unreasonable.

In any event, "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus [state actors] are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)).   Mr. Mercado has not pointed to—and the Court's research has not revealed—any binding caselaw clearly establishing that medical professionals use excessive force when they restrain a pretrial detainee for purposes of administering necessary medical care and testing in circumstances like the ones presented

19

here.  The Medical Defendants are therefore entitled to qualified immunity on Mr. Mercado's claims of excessive force.

For the foregoing reasons, Defendants' Motion for Summary Judgment, [Filing No. 33], is **GRANTED** with respect to the excessive force claims.

    *3.  Failure to Intervene*

Defendants argue that "[t]here is simply no legal justification supporting a failure to intervene charge against [the Medical Defendants] when considering the totality of the circumstances."  [Filing No. 34 at 17.]  They contend that Mr. Mercado created the situation of which he complains because he was "violent, combative, agitated, uncooperative and screaming," but the Medical Defendants did not use excessive force against him nor have any knowledge of Mr. Mercado being choked or his Fourth Amendment rights being violated. [Filing No. 34 at 18.]

In response, Mr. Mercado asserts that one of the officers was choking him while the Medical Defendants "did nothing."  [Filing No. 41 at 2; *see also* Filing No. 47 at 9.]  He argues that the Medical Defendants "allowed [him] to be hurt by officers" during the taking of the Covid-19 test and that the Medical Defendants failed to prevent him from being "choked." [Filing No. 47 at 9.]

Defendants do not specifically address this claim in their reply.  [*See* Filing No. 50.]

A public official who is present and fails to intervene to prevent another from violating an individual's constitutional rights may be liable under § 1983 if he or she: (1) knows or has reason to know that the individual's constitutional rights are being violated; and (2) has a "realistic opportunity" to intervene.  *Doxtator v. O'Brien*, 39 F.4th 852, 864-65 (7th Cir. 2022). "'Whether [a state actor] had sufficient time to intervene or was capable of preventing the harm

caused by [another state actor] is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" *Id.* (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005)).

Even accepting Mr. Mercado's version of events as true and assuming that an officer put him in a brief chokehold while restraining him, the Court finds that no reasonable jury could conclude that any officer used excessive force for the same reasons that no reasonable jury could conclude that any of the Medical Defendants used excessive force.  Any force used by the officers in restraining Mr. Mercado was objectively reasonable under the circumstances. Because there was no excessive force by anyone, Mr. Mercado cannot sustain a claim against the Medical Defendants for failure to intervene.  *See Abdullahi*, 423 F.3d at 767-68 ("Though legally distinct, the fate of plaintiff's failure to intervene claim is closely linked to that of her excessive force claim since, by definition, if there was no excessive force then there can be no failure to intervene.").  Defendants' Motion for Summary Judgment, [Filing No. 33], is **GRANTED** as to all claims for failure to intervene.

> ### 4. *Deliberate Indifference*

Defendants argue that any claim for "deliberate indifference" fails because the medical care provided to Mr. Mercado was objectively reasonable under the circumstances.  [Filing No. 34 at 14-17.]  Defendants assert that courts considering the reasonableness of medical care provided to a detainee "usually do so in situations where the claim involves medical care that should have been rendered to an individual," but in this case Mr. Mercado was not denied medical services but instead was "unreasonably refusing" medical testing.  [Filing No. 34 at 15.] Accordingly, Defendants assert, applying deliberate indifference caselaw to Mr. Mercado's claims "is like trying to fit a square peg into a round hole."  [Filing No. 34 at 15.]  Nevertheless,

Defendants argue that no reasonable jury could find that the care provided was objectively unreasonable, because they addressed his serious medical need for a Covid-19 test by administering the test and addressed the possibility that he ingested drugs by performing an EKG and constant monitoring.  [Filing No. 34 at 15-17.]  Defendants also point out that Mr. Mercado's sedation was not contraindicated and caused no harm to him.  [Filing No. 34 at 17.]

Mr. Mercado responds that Dr. Locoh-Donou forcibly administered a shot without regard to the possibility that Mr. Mercado may have swallowed drugs.  [Filing No. 47 at 4.]

Defendants do not specifically address this claim in their reply.  [See Filing No. 50.]

Although Mr. Mercado frames his claim as one for "deliberate indifference," the Court construes the claim as a challenge under the Fourteenth Amendment to the adequacy of the medical care provided to him.  See McCann v. Ogle Cnty., Illinois, 909 F.3d 881, 884 (7th Cir. 2018) (recognizing that the Seventh Circuit's decision in Miranda v. County of Lake, 900 F.3d 335 (7th Cir. 2018), "replac[ed] deliberate indifference with a standard requiring a showing of objective reasonableness for a claim challenging the medical care provided to a pretrial detainee").[6]  A pretrial detainee alleging inadequate medical care under the Due Process Clause of the Fourteenth Amendment must make two showings.  McCann, 909 F.3d at 886.  First, he must show that the defendants "acted purposefully, knowingly, or perhaps even recklessly" in handling his medical care; "[a] showing of negligence or even gross negligence will not suffice."  Id. (quotations and citations omitted).  Second, the pretrial detainee must show that the defendants' actions were objectively unreasonable.  Id.

---

[6] To the extent that Mr. Mercado's claim could arguably be construed as a due process claim relating to the violation of his Fourteenth Amendment right to refuse medical treatment, the Seventh Circuit has indicated that a pretrial detainee "ha[s] no right to refuse treatment once he [is] arrested and transported to the emergency room" during the process of medically clearing him for jail, noting that "the state has a substantial interest in assuring the medical stability of its pretrial detainees."  Sullivan v. Bornemann, 384 F.3d 372, 378 (7th Cir. 2004).

The video evidence shows that Mr. Mercado did not inform the Medical Defendants (or anyone else) of the possibility that he may have swallowed narcotics until long after he had already been administered the shot intended to chemically sedate him. [*See* 1910 Bodycam at 36:30-37:55.] Before administering the shot to Mr. Mercado, Dr. Locoh-Donou repeatedly asked him if he was allergic to any medications, and Mr. Mercado did not respond, nor did he take that opportunity to disclose the fact that he may have previously swallowed narcotics. [1910 Bodycam at 36:20-36:30.]   Accordingly, it was not unreasonable for the Medical Defendants to order and administer the shot without regard to how it could potentially interact with swallowed narcotics, given that they had no knowledge of any swallowed narcotics.

Furthermore, after Mr. Mercado asserted that he had swallowed drugs, the Medical Defendants performed an EKG test, which did not reveal any acute findings, and they continued to monitor Mr. Mercado's cardiac activity, blood glucose, and sedation. [Filing No. 34-1 at 4-5.] Mr. Mercado does not offer any argument suggesting that these actions were objectively unreasonable under the circumstances, and the Court finds that no jury could conclude that they were.   Furthermore, Mr. Mercado does not provide any evidence suggesting that any alleged inadequacy in the care provided to him by the Medical Defendants resulted in any harm.   Indeed, he does not confirm whether he ever in fact swallowed any narcotics, nor does he allege that undetected swallowed narcotics caused him harm in any way.   *See Miranda*, 900 F.3d at 347 (explaining that, to recover on a due process claim involving inadequate medical care, the plaintiff must provide evidence demonstrating that the inadequacy of care "caused some degree of harm").

In sum, no reasonable jury could conclude that the medical care provided to Mr. Mercado was inadequate for purposes of the Fourteenth Amendment.  Defendants' Motion for Summary Judgment, [Filing No. 33], is **GRANTED** as to this claim.

5. *Racial Discrimination and Equal Protection*

Defendants argue that "the mere fact that Mr. Mercado happens to be African American does not, without more, create a presumption of race discrimination," and "[a] mere conclusory allegation of intentional discrimination is insufficient for the matter to go to trial."  [Filing No. 34 at 20.]  Defendants assert that it is undisputed that Covid-19 testing was being done frequently at the Hospital on individuals receiving care, regardless of their race, color, national origin, religion, or sex.  [Filing No. 34 at 20.]

Mr. Mercado does not discuss racial discrimination or equal protection in his response. [*See* Filing No. 40; Filing No. 41; Filing No. 45; Filing No. 46; Filing No. 47.]

Defendants do not specifically address this claim in their reply.  [*See* Filing No. 50.]

It is well-settled that "a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *De v. City of Chicago*, 912 F. Supp. 2d 709, 733 (N.D. Ill. 2012) (quoting *Reklau v. Merch. Nat'l Corp.*, 808 F.2d 628, 630 n. 4 (7th Cir. 1986)).  When the party fails to respond to the other side's argument, the party waives its opposition to that argument.  *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."); *see also Mwangangi v. Nielsen*, 48 F.4th 816, 832 (7th Cir. 2022) (stating that "[a] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is a good point despite a lack of supporting authority or in the face of contrary authority, forfeits the point") (internal quotations and citation omitted) (alteration original).  In addition, "[f]ailure to set forth any evidence or to

24

develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of his claims." *De*, 912 F. Supp. 2d at 734 (citing, *inter alia*, *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) ("[B]ecause [the plaintiff] failed to delineate his negligence claim in his district court brief in opposition to summary judgment . . . his negligence claim is deemed abandoned.")).

Because Mr. Mercado did not respond to Defendants' arguments concerning his claims of racial discrimination and equal protection violations, he has waived any argument in opposition. In addition, because Mr. Mercado did not mention these claims in his summary judgment briefing, he has abandoned these claims.  As a result, Defendants' Motion for Summary Judgment, [Filing No. 33], is **GRANTED** as to any potential race discrimination and equal protection claims.

### 6.  *Conspiracy*

Defendants argue that Mr. Mercado cannot establish a conspiracy under 42 U.S.C. § 1985 because he has no evidence demonstrating a racial or other class-based discriminatory animus motivating the Medical Defendants' alleged conduct. [Filing No. 34 at 19-20.]

In response, Mr. Mercado asserts that the Medical Defendants violated § 1985 because they "conspired with the Columbus Police Department and with themselves to violate [his] 4th Amendment right by forcing a medical test on [him] without a warrant and using excessive force then lying about it." [Filing No. 47 at 10.]

Defendants do not specifically address the conspiracy claim in their reply. [*See* Filing No. 50.]

Section 1985(3) "provides a cause of action for persons who are victims of a conspiracy to deprive them of the equal protection of the laws or equal privileges and immunities under the

laws." *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 827 (7th Cir. 2022) (internal quotations and citations omitted).  A plaintiff bringing a claim under § 1985(3) must prove: (1) the existence of a conspiracy; (2) that the conspiracy was for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property or a deprivation of any right or privilege of a citizen of the United States.  *Id.* (citing *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 828-29 (1983)). Additionally, the plaintiff must prove that the conspiracy was motivated by a racial or other class-based invidiously discriminatory animus.  *Milchtein*, 42 F.4th at 827 (quoting *Bowman v. City of Franklin*, 980 F.2d 1104, 1109 (7th Cir. 1992)).

Here, Mr. Mercado does not present any evidence suggesting that any Defendant's conduct was motivated by racial or other discriminatory animus.  He also does not develop any arguments in his summary judgment briefing concerning racial or other discrimination, and therefore any such argument is waived.  *See Mwangangi*, 48 F.4th at 832; *Bonte*, 624 F.3d at 466; *Palmer*, 327 F.3d at 597-98.  Accordingly, Defendants' Motion for Summary Judgment, [Filing No. 33], is **GRANTED** with respect to Mr. Mercado's § 1985 conspiracy claim.[7]

---

[7] Additionally, the Court notes that although the parties discuss Mr. Mercado's conspiracy claim under § 1985, a plaintiff may also pursue relief under § 1983 where the defendants conspired to deprive him of his constitutional rights.  "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015).  Because Mr. Mercado has not demonstrated an underlying constitutional violation, any potential claim for conspiracy under § 1983 would also fail.  *See Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (explaining that a plaintiff alleging conspiracy "must show an underlying constitutional violation and demonstrate that the defendants agreed to inflict the constitutional harm") (quotations and citation omitted).

7. *Torture*

Defendants assert that Mr. Mercado's argument that the Medical Defendants tortured him as defined in 18 U.S.C. § 2340 fails as a matter of fact and law.  [Filing No. 34 at 20-21.] Specifically, they contend that the torture statute applies only to acts of torture committed outside of the United States and therefore does not apply to Mr. Mercado's treatment at the Hospital.  [Filing No. 34 at 20-21.]

In response, Mr. Mercado states that his claim under § 2340 "evolve[s] out of the excessive force used against [him] from the Defendants to extract information in the results of a Covid-19 test and failing to intervene on [his] behalf while allowing and participating in excessive force."  [Filing No. 47 at 1.]  He argues that because he was a prisoner being held by state actors and the Medical Defendants used excessive force and inflicted pain to "extract information from a Covid-19 test," he has sufficiently asserted a claim under § 2340.  [Filing No. 47 at 10.]

Defendants do not specifically address this claim in their reply.  [*See* Filing No. 50.]

Section 2340 defines "torture" to mean an "act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control."  A separate statute, 18 U.S.C. § 2340A, defines the offense of torture, stating in relevant part that "[w]hoever outside the United States commits or attempts to commit torture shall be fined under this title or imprisoned not more than 20 years."  Neither of these provisions create a private cause of action for civil damages resulting from alleged torture.  *See Renkel v. United States*, 456 F.3d 640, 644-45 (6th Cir. 2006) ("[Sections 2340 and 2340A] criminalize torture outside the United States; they do not provide civil redress for torture within the United

States.  For the latter, a plaintiff must pursue [his] claim under the appropriate domestic law, which might include the [Federal Tort Claims Act] or the Eighth Amendment, and meet the jurisdictional and substantive requirements for civil relief."); *Story v. Best Way Transportation Inc.*, 2020 WL 5045658, at *4 (N.D. Tex. Aug. 4, 2020), *report and recommendation adopted*, 2020 WL 5038503 (N.D. Tex. Aug. 26, 2020) (acknowledging that "no private cause of action exists under" § 2340); *Jamison v. Langston*, 2006 WL 2787844, at *2 (S.D. Ga. Sept. 25, 2006) ("Section 2340A is a criminal statute and does not allow an individual to pursue a claim in a civil proceeding.  To the extent Plaintiff seeks to recover for acts of torture, as defined in this statute, he cannot do so.").  Instead, Mr. Mercado's torture claim is more appropriately understood as a claim for excessive force in violation of the Fourth or Fourteenth Amendment, as discussed above.  Accordingly, Defendants' Motion for Summary Judgment, [Filing No. 33], is **GRANTED** as to the claim of torture.

> 8.  *"Human Rights Violation"*

Although Defendants recognize Mr. Mercado's claim for "Human Rights Violation," [*see* Filing No. 34 at 1-2 (listing the claims asserted in the Amended Complaint)], they do not make any specific argument concerning this claim in their briefing, [*see* Filing No. 34].  Mr. Mercado similarly does not make any specific arguments in his response concerning any "Human Rights Violation."  [*See* Filing No. 40; Filing No. 41; Filing No. 45; Filing No. 46; Filing No. 47.] Accordingly, the Court interprets Mr. Mercado's reference in the Amended Complaint to "Human Rights Violation" to be merely another label for his constitutional claims, each of which has been discussed above, and does not analyze it as a separate claim.

**B. State Law Claims**

*1. Supplemental Jurisdiction*

Because the Court has granted Defendants' Motion for Summary Judgment on all of Mr. Mercado's federal claims, it must determine whether it will exercise jurisdiction over his state law claims.  *See, e.g.*, *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012) ("When federal claims drop out of the case, leaving only state-law claims, the district court has broad discretion to decide whether to keep the case or relinquish supplemental jurisdiction over the state-law claims.").  When deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quotations and citations omitted).  Although there is a presumption in favor of relinquishing jurisdiction, the presumption may be overcome in certain circumstances, including when "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort," or "when it is absolutely clear how the pendent claims can be decided." *RWJ Mgmt. Co.*, 672 F.3d at 480 (quoting *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514-15 (7th Cir. 2009)).

The Court finds that exercising supplemental jurisdiction over Mr. Mercado's state law claims is appropriate in this case.  Most significantly, this case has already reached the summary judgment stage, and remanding it to state court for consideration of the state law claims would waste judicial resources and result in a substantial duplication of effort.  As a result, the judicial economy factor weighs heavily in favor of exercising jurisdiction.  Furthermore, a state forum would not be significantly more convenient or fair for the parties, and no party would be prejudiced by the Court exercising jurisdiction over the state law claims.  Finally, for the reasons

outlined below, it is clear how the state law claims should be decided based on principles of waiver and immunity.   Accordingly, the Court will not relinquish jurisdiction over Mr. Mercado's state law claims.

> 2.   *Merits*

Defendants assert that Mr. Mercado's state law claims are barred for the following reasons: (1) Defendants are entitled to immunity under Indiana Code §§ 34-30-13.5-1 and 34-30-13.5-3, which immunize individuals and facilities providing healthcare services in response to an event that is declared a disaster or emergency; (2) all claims except for those of medical malpractice are subject to the notice requirements of the Indiana Tort Claims Act ("ITCA"), and Mr. Mercado failed to comply with those requirements; and (3) all of Mr. Mercado's claims fall within the purview of the Indiana Medical Malpractice Act ("IMMA"), and Mr. Mercado failed to comply with the exhaustion requirements of that statute.  [Filing No. 34 at 24-27.]

In response, under a heading titled "State Claims," Mr. Mercado, without elaboration, "admits to giving no notice as required by the Tort Claims Act." [Filing No. 47 at 10.]  He does not address any of Defendants' other arguments concerning the state law claims.

Defendants do not specifically address the state law claims in their reply.  [*See* Filing No. 50.]

Because Mr. Mercado concedes that he did not comply with the notice requirements of the ITCA, any of his claims subject to the ICTA are barred.  *See, e.g., Murphy v. Indiana State Univ.*, 153 N.E.3d 311, 317 (Ind. Ct. App. 2020) ("The [ITCA] provides that a tort claim against a government entity is barred unless the claimant provides the entity with timely notice of the claim.").  Specifically, the ICTA requires that a plaintiff give notice of any "claim against a political subdivision," Ind. Code § 34-13-3-8(a), and defines "political subdivision" to include a

"city or county hospital," Ind. Code § 34-6-2-110(8).   Accordingly, any claims against the Hospital, Nurse Berry, and Nurse Fluhr that are subject to the ICTA are barred for failure to provide the required notice.  *See Alexander v. City of S. Bend*, 256 F. Supp. 2d 865, 875 (N.D. Ind. 2003) ("The ITCA applies to suits against employees of political subdivisions as well as the subdivisions themselves.") (citing *Davidson v. Perron*, 716 N.E.2d 29, 34 (Ind. Ct. App. 1999)).

But the inquiry does not end there, because to the extent that Mr. Mercado's claims fall within the purview of the IMMA, the ITCA's notice requirement does not apply and therefore would not bar Mr. Mercado's claims.  *See Putnam Cnty. Hosp. v. Sells*, 619 N.E.2d 968, 969 (Ind. Ct. App. 1993) ("[B]ecause we conclude that [plaintiff's] claim is one of medical malpractice, the notice provisions of the Tort Claims Act do not apply.").   And, although Defendants raise the issue of the ITCA, they simultaneously argue that "Mr. Mercado's state law claims *all* appear to fall within the purview and requirements of the [IMMA]" and therefore would not be subject to the ITCA.   [Filing No. 34 at 27 (emphasis added).]   Despite this inconsistency, the Court concludes that the IMMA—not the ITCA—applies in this case to bar Mr. Mercado's state law claims.

Mr. Mercado does not respond to Defendants' arguments that all Defendants are qualified healthcare providers under the IMMA or that all of his state law claims fall within the purview of the IMMA, and therefore he has waived any opposition to those arguments.  *See Mwangangi*, 48 F.4th at 832; *Bonte*, 624 F.3d at 466; *Palmer*, 327 F.3d at 597-98.   Regardless, and in the interest of completeness, the Court notes that to determine whether a claim falls within the purview of the IMMA, courts "look to the substance of a claim, not the manner in which the conduct is framed in a pleading by the claimant."  *G.F. v. St. Catherine Hosp., Inc.*, 124 N.E.3d 76, 85 (Ind. Ct. App. 2019).  "A medical malpractice claim under the [IMMA] exists only when the substance

of the claim involves a causal connection between the negligence and the nature of the provider/patient relationship." *Id*.  The provider's conduct must be "curative or salutary in nature or effect," meaning it is undertaken in the interest of, or for the benefit of, the patient's health. *Id*. (citation omitted).  The IMMA will not apply to general negligence that may occur during the course of ongoing medical treatment if the allegedly negligent act "does not involve curative or salutary conduct, the promotion of the patient's health, or the exercise of professional expertise, skill, or judgment." *Id*.  Any claim under the IMMA must be presented to a medical review panel before the plaintiff can proceed in court, and the "medical review panel requirement is a substantive feature of the [IMMA] that must be enforced in federal court." *Thompson v. Cope*, 900 F.3d 414, 424 (7th Cir. 2018); Ind. Code § 34-18-8-4.

Mr. Mercado's remaining state law claims consist of: (1) negligence (which he also calls "Violation of Reasonable Duty of Care"); (2) intentional infliction of emotional distress; and (3) "Responde[a]t Superior Liability."   [*See* Filing No. 15 at 5-7.]   Although he does not precisely articulate the basis for each of his state law claims, the acts of which he primarily complains include the Medical Defendants: (1) ordering and administering chemical sedation without regard to the possibility that he may have swallowed narcotics; (2) forcibly holding him down to administer the sedation or to perform the Covid-19 test; and (3) failing to provide adequate care or monitoring.  The Court finds that all of these claims fall within the purview of the IMMA.  And because there is no evidence that Mr. Mercado presented his claims to a medical review board, his state law claims are barred under the IMMA.  *See Thompson*, 900 F.3d at 424; Ind. Code § 34-18-8-4.

In sum, because Mr. Mercado has waived any argument that summary judgment on his state law claims is not warranted, and because the claims are barred by the IMMA, Defendants'

Motion for Summary Judgment, [Filing No. 33], is **GRANTED** as to all of Mr. Mercado's state law claims against all Defendants.

### IV.
#### CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment, [33], is **GRANTED**.  Final judgment shall issue accordingly.

Date: 11/28/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

**Distribution via U.S. Mail to:**

Angelito Mercado
Bartholomew County Jail
543 2nd Street
Columbus, IN 47201